1

2

3

4

5                     IN THE UNITED STATES DISTRICT COURT

6                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    ELIZABETH ORTIZ, et al.,                    No. C -12-05859 EDL

9              Plaintiffs,                        **ORDER DENYING PLAINTIFFS'**
                                                 **MOTION FOR CLASS CERTIFICATION**
10      v.

11   CVS CAREMARK CORPORATION, et al.,

12             Defendants.
     _____/

13

14        Plaintiff employees seek damages for unpaid off-the-clock work for deliveries and mileage

15   reimbursement under California law.  Plaintiffs seek to certify a class with three subclasses of non-

16   exempt employees who worked for Defendants in California at approximately 1,000 CVS stores:

17        (1) "Inter-store unpaid wages class," consisting of all non-exempt hourly CVS
          employees from September 13, 2008 to the present who transported medications
18        and/or merchandise from one CVS store to another CVS store and were not paid for
          that time;
19
          (2) "Inter-store unpaid expense reimbursement class," consisting of all non-exempt
20        hourly CVS employees from September 13, 2008 to the present who transported
          medications and/or merchandise from one CVS store to another CVS store and were
21        not reimbursed for mileage or other expenses; and

22        (3) "Inter-store underpaid expense reimbursement class," consisting of all non-
          exempt hourly CVS employees from September 13, 2008 to the present who
23        submitted mileage reimbursement requests and did not receive the full reimbursement
          required by law.
24

25   Plaintiffs also allege dependant claims seeking penalties for failure to furnish accurate wage

26   statements (Labor Code § 226), waiting time penalties for failure to pay all wages owed upon

27   termination (Labor Code §§ 201-203), and failure to maintain accurate payroll records (Labor Code

28   § 1174).

          For the reasons stated at the hearing and in this Order, Plaintiffs' Motion for Class

United States District Court
For the Northern District of California

1    Certification is denied.  A case management conference is scheduled for January 14, 2014 at 3:00

2    p.m.  A joint case management conference statement shall be filed no later than January 7, 2014.

3    **Facts**

4        Plaintiff Elizabeth Ortiz began working at the CVS location in Indio, California as a clerk

5    cashier in October 2008.  Von Rock Decl. Ex. C (Ortiz Decl.) ¶ 2.  Ortiz transferred to the Palm

6    Desert store in 2009, and towards the end of 2009, she was promoted to the position of Head

7    Cashier.  Id.  She is in the process of training to be a shift supervisor in the Indian Wells store,

8    although she is currently on medical disability.  Id.  Ortiz has been classified as a non-exempt

9    employee throughout her employment with CVS.  Id.

10       Plaintiff Gail Miller began working for Sav-On in 2000 and in approximately 2006, when

11   CVS purchased Sav-On, Miller became a CVS employee in the position of District Pharmacy

12   Scheduling.  Von Rock Decl. Ex. C (Miller Decl.) ¶ 2.  In 2008, Miller transferred to the Tujunga

13   store as a Photo Supervisor.  Id.  In 2009, she transferred to the position of a Pharmacy Service

14   Associate, and in 2011, she became licensed as a Pharmacy Technician, which is her current

15   position.  Id.  Miller has been classified as a non-exempt employee throughout her employment with

16   CVS.  Id.

17       Defendant CVS operates numerous stores in California.  See Von Rock Decl. Ex. A at 4

18   (stating that as of July 16, 2013, there were approximately 1,058 CVS stores in California); but

19   see Luker Decl. ¶ 3 (stating that as of July 2013, there were approximately 850 CVS stores in

20   California).  Non-exempt employees were employed in at least forty-three different non-exempt

21   positions that had varying responsibilities.  Luker Decl. ¶ 5; Seymour Decl. ¶¶ 7-8, Ex. A-D.  As of

22   July 19, 2013, there were approximately 21,183 non-exempt employees working in CVS stores in

23   California.  Von Rock Decl. Ex. A at 5.  Also as of July 19, 2013, approximately 52,144 non-exempt

24   employees had worked in CVS stores in California between September 13, 2008 and the present.

25   Id.; Luker Decl. ¶ 4.  Of the 52,144 non-exempt employees, approximately 19,022 non-exempt

26   employees with pharmacy-related titles have worked in CVS stores in the Pharmacy Departments in

27   California between September 13, 2008 and the present.  Von Rock Decl. Ex. A at 6.

28       **Inter-store transfer (IST)**

2

United States District Court
For the Northern District of California

1    Inter-Store Transfers (ISTs) occur when merchandise or prescriptions are picked up from one

2    CVS store and delivered to another CVS store.  Two of the proposed subclasses focus on employees

3    who conducted ISTs and did not get paid for their time because the IST occurred before or after their

4    shift or when they were otherwise clocked out.

5    Defendants' policies prohibit employees from working off the clock.  See, e.g., Seymour

6    Decl. ¶ 15; Ex. H ("Your Guide to Caremark") at 46 (stating in part: "When you work, you must

7    report all of the time you work. Non-exempt employees are prohibited from working 'off-the-clock'

8    (i.e., without reporting the time worked).").  Further, employees are required to be clocked in at any

9    time they are working.  Id.  Every non-exempt employee must be paid for all hours worked, and it is

10   against CVS policy to modify time records or fail to report hours worked.  Seymour Decl. Ex. E

11   ("SucceSSS: Stock, Shop, Service") at 10; Ex. H at 46.  Willful violation of timekeeping policies,

12   including falsifying time cards or encouraging others to do so, can result in immediate termination.

13   Seymour Decl. Ex. F "CVS Caremark Code of Conduct") at 22; Ex. G ("Your Guide to Caremark")

14   at 17-18.  Further, Defendants' policies require employees to verify that the hours worked and

15   amounts paid on their paychecks are accurate.  Seymour Decl. Ex. H at 45-46 ("Please review each

16   paycheck or pay stub when you received it to make sure your pay is correct.  If you believe an error

17   has occurred or if you have any questions about your paycheck or pay stub, promptly report the

18   matter to your supervisor, Human Resources Manager or the Contact Support Center.").  If

19   employees work while not clocked in, such as when performing ISTs, they are expected to inform

20   the store manager to ensure payment of all wages.  Seymour Decl. ¶ 16.

21   It is undisputed that CVS employees conduct ISTs.  See, e.g., Von Rock Decl. Ex. B at 91.  It

22   is also undisputed that some of the ISTs occur while employees are off the clock, such as on their

23   way to work or on their way home.  Id. at 30-31; see also, e.g., Von Rock Decl. Ex. C ¶ 10-11

24   (Ashby Decl.); Ex. C ¶ 11 (Boone Decl.); Ex. C (Chin Decl.) ¶ 10.  Plaintiffs argue that CVS had an

25   "on-the-ground" policy of directing employees to perform ISTs before or after their shifts or on their

26   meal break, resulting in employees not being compensated for their time conducting the ISTs.  See,

27   e.g., Von Rock Decl. Ex. C (Ashby Decl.) ¶ 10-11; Ex. C (Boone Decl.) ¶ 11; Ex. C (Chin Decl.) ¶

28   10.

3

1   Plaintiffs' declarants do not indicate whether they requested, but were denied, wages for the

2   ISTs that they conducted.  Rather, Plaintiffs state that because the ISTs were done at the behest of

3   CVS managers, CVS should have taken affirmative steps to make sure that employees were

4   compensated for the time for the IST.  However, Defendants' timekeeping policy, on which every

5   employee is trained, requires that employees document their hours accurately and review their

6   paychecks for errors.  Seymour Decl. ¶¶ 9-11, 17-18.  Further, every employee is required to verify

7   the accuracy of his or her time card and submit a signed copy to the store manager or supervisor.

8   Seymour Decl. ¶ 18.

9   Defendants record each IST in a database called a "Key Rec" report.  Von Rock Decl. Ex. B

10  (Seynour Decl.) at 46.  The Key Rec report records the merchandise that leaves or comes into a

11  store.  Id. at 92.  More specifically, the Key Rec report identifies the sending and receiving store,

12  providing some information about the item being transferred, including whether it was a front store

13  or pharmacy item, and the date of the transfer.  Von Rock Decl. Ex. F.  According to Defendants'

14  Federal Rule of Civil Procedure 30(b)(6) witness, there is no record by CVS of which employee

15  performed the IST.  Von Rock Decl. Ex. B at 93.  Plaintiffs, however, have provided evidence that

16  employees signed another document showing that they completed the IST and that the document

17  was kept with the Key-Rec file.  See Supp. Von Rock Decl. Ex. B (Boone Supp. Decl.) ¶ 4 ("It was

18  also CVS policy that I sign paperwork associated with each inter-store transfer.  The inter-store

19  transfer paperwork that I signed was then placed into a binder/folder maintained by CVS store

20  management at my home store with the Key Rec report documenting that the inter-store transfer had

21  been completed."); Ex. O (Kellett Depo.) at 49-51 (testifying that there is paperwork that shows who

22  completed the IST and that paperwork goes in a file).

23  **Mileage reimbursement**

24  Plaintiffs' proposed second and third subclasses address mileage reimbursement.

25  Defendants' policy provides that Defendants shall reimburse employees for all necessary business

26  expenses, including use of their personal vehicle.  Seymour Decl. ¶ 21.  Employees who conduct

27  ISTs are entitled to recover such business expenses.  Id.  For reimbursements of expenses that

28  employees incur while using their personal vehicles, Defendants use a mileage reimbursement

4

method, which reimburses employees for every mile they drive that exceeds their normal daily commute.  Seymour Decl. ¶¶ 22-23.  From 2007 to 2008, the mileage reimbursement rate was $0.41 per mile.  Id. ¶ 23; Ex. K.  Beginning in 2009, mileage has been reimbursed at the rate of $0.45 per mile.  Id. ¶ 23; Ex. L.

Plaintiff Ortiz was aware of the mileage reimbursement policy, submitted paperwork for expenses incurred, and received payment.  Weil Decl. Ex. C (Ortiz Depo) at 144; Ex. E (Ortiz Depo.) at 11-14.  Plaintiff Miller mistakenly thought that she was only entitled to reimbursement for ISTs that occurred during the middle of her shift, and so did not seek reimbursement.  Weil Decl. Ex. A (Miller Depo.) at 138-39; 224-26.

Plaintiffs argue that Defendants should have known that employees incurred mileage related expenses because Defendants' store managers told them to conduct ISTs, and the Key Rec reports showed that ISTs were taking place.  See Von Rock Decl. Ex. F (Key Rec reports).  Plaintiffs also argue that Defendants did not have a policy to take affirmative steps to reimburse employees for mileage related expenses incurred for ISTs.  However, the evidence shows that whether Defendants take affirmative steps to reimburse employees varies from store to store.  Von Rock Decl. Ex. B at 92.  Plaintiffs also argue that Defendants underpaid mileage reimbursements because Defendants' per mile rate is lower than the IRS rate, which ranged from $0.55 to $0.56.5 during the class period.  Pls.' Request for Judicial Notice Ex. B (IRS standard mileage rates).

**Legal Standard**

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b).  See General Tel. Co. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977).  Rule 23(a) provides that a case is appropriate for certification as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the

**United States District Court**
For the Northern District of California

1  class.

2  Fed. R. Civ. P. 23(a).  Plaintiff seeks class certification under Rule 23(b)(1), (2) and (3), which

3  provide that a case may be certified as a class action if:

4      (1) prosecuting separate actions by or against individual class members would create
       a risk of:

5

6      (A) inconsistent or varying adjudications with respect to individual class members
       that would establish incompatible standards of conduct for the party opposing the
       class; or

7

8      (B) adjudications with respect to individual class members that, as a practical matter,
       would be dispositive of the interests of the other members not parties to the
       individual adjudications or would substantially impair or impede their ability to

9      protect their interests;

10     (2) the party opposing the class has acted or refused to act on grounds that apply
       generally to the class, so that final injunctive relief or corresponding declaratory

11     relief is appropriate respecting the class as a whole; or

12     (3) the court finds that the questions of law or fact common to class members
       predominate over any questions affecting only individual members, and that a class

13     action is superior to other available methods for fairly and efficiently adjudicating the
       controversy. The matters pertinent to these findings include:

14

15     (A) the class members' interests in individually controlling the prosecution or defense
       of separate actions;

16     (B) the extent and nature of any litigation concerning the controversy already begun
       by or against class members;

17

18     (C) the desirability or undesirability of concentrating the litigation of the claims in
       the particular forum; and

19     (D) the likely difficulties in managing a class action.

20  Fed. R. Civ. P. 23(b).

21      Only Rule 23(b)(3) could provide a basis for class certification here.  "Rule 23(b)(2) . . . does

22  not authorize class certification when each class member would be entitled to an individualized

23  award of monetary damages."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2557 (2011).  Here,

24  Plaintiffs are seeking primarily monetary damages.  See Mot. at 22.  Further, classes certified under

25  (b)(1) require that individual adjudications would be impossible or unworkable.  Id. at 2558.  Here,

26  Plaintiffs seek individual adjudications of damages.  As the Supreme Court stated in Dukes, ". . . we

27  think it clear that individualized monetary claims belong in Rule 23(b)(3)."  Id. at 2558.

28

**United States District Court**
For the Northern District of California

**Discussion**

**1.      Ascertainability**

As a threshold matter, before reaching the requirements of Rule 23, the party seeking class certification must demonstrate that an identifiable and ascertainable class exists.  See Mazur v. eBay, Inc., 257 F.R.D. 563, 567 (N.D. Cal. 2009).  "An implied prerequisite to certification is that the class must be sufficiently definite." Whiteway v. FedEx Kinko's Office & Print Servs., Inc., 2006 WL 2642528, at *3 (N.D. Cal.2006).  "A class definition should be precise, objective, and presently ascertainable," though "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal.1998) (internal quotations omitted).

**A.      Subclasses involving ISTs**

Defendants have presented evidence that there are no records of which employees performed ISTs. Kaplan, who is CVS's Compliance Manager of Store Operations, stated that Defendants do not maintain records reflecting who performs ISTs.  Kaplan Decl. ¶ 14.  Defendants' Rule 30(b)(6) witness Seymour testified that the Key Rec report does not show which employee conducted the IST.  Von Rock Decl. Ex. B at 93.  Defendants note that at least one employee submitted a sworn statement that he conducted ISTs and then recanted at his deposition, stating that he did not conduct any ISTs. See Von Rock Decl. Ex. C (Cohn Decl.) ¶ 5 ("I performed inter-store transfers on a number of occasions and wasn't paid for that time that I spent transferring items.  A manager at CVS told me to do these transfers off the clock and told me where to pick up or deliver the medication and/or merchandise."); Weil Decl. Ex. F (Cohn depo.) at 32 ("I can't remember specifically transferring a medicine and not – you know, being asked specifically to transfer a medicine and not being paid"); Supp. Cohn Decl. ¶¶ 8-9 (clarifying that he thought inter-store transfers meant that he himself was transferred from store to store to work because he was a floater employee).  In addition, the Key-Rec reports do not reflect whether the IST occurred while an employee was punched into the timeclock or whether Defendants later compensated the employee for the time.  Employees who conducted ISTs may have had their time adjusted by their managers as required by the policies requiring compensation for all time.  Further, some employees who conducted ISTs purposefully did

not seek compensation for their time or mileage because they did not think it was worth it.  See, e.g., Defs,' Compendium of Declarations Connaughton Decl. ¶ 6; Cheney Decl. ¶ 10.  Also, there are cases in which the employee who performed the IST did not work at either the sending or receiving store.  Def.'s Compendium Ex. 45 (Schmidt Decl.) ¶ 7 (stating that on one occasion, his son performed a transfer even though the son did not work at either the sending or receiving store).  Even though the Key-Rec report shows whether the transferred merchandise was a front store item or a pharmacy item, that information does not necessarily narrow down significantly who within the store performed the IST because in at least one case, front store employees transferred medications for the pharmacy department.  See Weil Decl. Ex. K (Chin Depo.) at 8, 13.

Moreover, Defendants' inventory activity report (IAR) does not reflect who performed an IST.  Seymour Supp. Decl. ¶ 6 ("To ensure proper payment of merchandise and tracking of inventory, CVS attempts to maintain records of merchandise transfers to and from each CVS store location through IARs.  IARs, however, do not provide information about who performed an IST; when it was performed; whether the time spent conducting any ISTs went unpaid; or whether any employee incurred reimburseable mileage that also went unpaid.");  Bradley Decl. ¶ 6 (Store Manager: "These IARs do not reflect who conducted an IST, whether any ISTs were conducted by an employee from my store, or when items might have been delivered or picked up.  The IARs do not include any employee-related data.");  Serrato Decl. ¶ 6 (same);  Ramos Decl. ¶ 6 (same);  Pettit Decl. ¶ 6 (same).

Further, there is evidence that there is no consistent policy or practice requiring employees to sign documentation when they perform ISTs.  Seymour Supp. Decl. ¶ 8 ("With respect to ISTs, I am unaware of any written CVS policy or practice requiring an employee to sign any IST-related paperwork when merchandise is delivered or picked up. I am also unaware of any store following this practice.");  Serrato Decl. ¶ 8 ("I am not aware of any CVS policy requiring an employee from either the receiving or sending store to sign IST-related paperwork when picking up or delivering items.  I personally have never required any CVS employees to sign any paperwork when they pick up or deliver.");  Pettit Decl. ¶ 7 ("As far as I am aware, CVS does not have a policy requiring an employee from either the receiving or sending store to sign any paperwork when picking up or

delivering items.  I have never required any employees to sign any paperwork when they pick up or deliver items during an IST."); Ramos Decl. ¶ 7 (same); Bradley Decl. ¶ 7 (same).  Further, some CVS stores do not conduct ISTs, and in some stores, only exempt employees perform ISTs.  See, e.g., Defs.' Compendium of Declarations, Gibson Decl. ¶ 11.  Yet in some other stores, any employee can be asked to do an IST.  See, e.g., Defs' Compendium of Declarations, Neal Decl. ¶ 5. Some managers allow employees to perform ISTs before clocking in for a shift (see, e.g., id. Barragan Decl. ¶ 12), and others only permit employees to perform ISTs while clocked in (see, e.g., id. Ager Decl. ¶ 8).

Plaintiffs have provided evidence that two employees signed paperwork as part of an IST pursuant to at least what they believed to be their store's policy at the time, which was placed in a file related to the IST that was maintained by the store manager.  See Supp. Von Rock Decl. Ex. B (Boone Supp. Decl.) ¶ 4 ("It was also CVS policy that I sign paperwork associated with each inter-store transfer.  The inter-store transfer paperwork that I signed was then placed into a binder/folder maintained by CVS store management at my home store with the Key Rec report documenting that the inter-store transfer had been completed."); Ex. O (Kellett Depo.) at 49-51 (testifying that there is paperwork that shows who completed the IST and that paperwork goes in a file).  Plaintiffs also claim that they can also identify employees who completed ISTs but did not complete such paperwork by cross-referencing the Key-Rec reports (which themselves do not reflect who did an IST or when or how it occurred, see Kaplan Decl. ¶¶ 12, 14) with attendance records.  Even if the pool of potential class members was limited to those employees who worked at a receiving store on the day of an IST, however, individual inquiries into which of these employees conducted an IST on a certain day would still be necessary.  Kaplan Decl. ¶ 10 (stating that Defendants do not provide any direction to the sending or receiving store about how to conduct the transfer); see also Deitz v. Comcast Corp., 2007 U.S. Dist. LEXIS 53188, at *24-26 (N.D. Cal. July 11, 2007) ("Class A is ill-defined and not clearly ascertainable. Determining who the Class A members are would require "answer[ing] numerous individualized fact-intensive questions." Fogarazzo v. Lehman Bros., 232 F.R.D. 176, 181 (S.D.N.Y. 2005). The members of the putative converter-box renter class must have had 'cable-ready television set(s) or a video cassette or DVD recorder or player.' There would be no

9

1  easy way to determine which subscribers owned a cable-ready television during the relevant class

2  period. Plaintiff nowhere cites, nor has the Court found in the voluminous record, any Comcast

3  records that contain information on the types of devices owned by its subscribers. It would be

4  impossible to determine without significant inquiry which subscribers owned such devices.").

5  　　　　Although Plaintiffs need not establish the identities of all class members at this stage

6  (Donovan v. Philip Morris USA, Inc., 2012 U.S. Dist. LEXIS 37974, at *91 (D. Mass. Mar 21,

7  2012)), Plaintiffs have also not provided evidence from which the Court can determine whether there

8  is a reliable method to determine the class members.  See See In re Chocolate Confectionary

9  Antitrust Litig., 2012 U.S. Dist. LEXIS 174681, at *99 (M.D. Pa. Dec. 7, 2012) ("Dr. McClave also

10  explains the manner in which his statistical analysis is useful to estimate impact on a class-wide

11  basis and to identify any customers who were not harmed, and thus eliminate them from the class.").

12  　　　　The evidence shows that as to many, if not most ISTs, no information was recorded as to

13  which employee made the transfers, so the subclasses are unascertainable.  But the Court relies

14  primarily on Plaintiffs' failure to satisfy the requirements of Rule 23(a), as described below, in

15  denying certification of the proposed subclasses.

16  　　　　**B.　　　Third subclass**

17  　　　　The third proposed subclass consists of employees who submitted mileage reimbursement

18  requests, but were allegedly not compensated for the full reimbursement amount because Defendants

19  paid less than the Internal Revenue Service standard rate for mileage.  Thus, this class is

20  ascertainable because it consists of employees who can be identified by their requests for

21  reimbursement.

22  　　　　Defendants note that not every IST required reimbursement at the IRS rate or any other rate

23  because in some cases, employees completed the IST at a store located on their normal commuting

24  route between their home store and their residence, and so did not incur any additional mileage on

25  their daily commute.  See, e.g., Weil Decl. Ex. G (Boone Depo.) at 21-22.  Plaintiffs counter that the

26  failure to compensate employees for mileage at the IRS standard rate for an IST on their commute

27  path is improper because California law requires that employees be compensated while "an

28  employee is subject to the control of an employer."  See Morillion v. Royal Packing Co., 22 Cal.4th

United States District Court
For the Northern District of California

575, 578 (2000).  However, the question raised by Plaintiffs is whether Defendants reimbursed

employees' expenses at the proper mileage rate, whereas in <u>Morillion</u>, the question was whether the

employees were paid for their time.  Further, here the employees drive their own cars, whereas in

<u>Morillion</u>, the employer required agricultural workers to be transported on a bus to a worksite so the

employees were under the employer's control while riding the bus.  <u>See id.</u> at 586.

Defendants also argue that Plaintiffs' proposed subclasses are impermissible "fail-safe"

classes.  In a fail-safe class, "the class members either win or are not in the class ... the Court cannot

enter an adverse judgment against the class."   <u>In re AutoZone Wage and Hour Employment</u>

<u>Practices Litig.</u>, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012).  Here, even if the subclasses are fail-safe

classes, the class definitions could be modified, if necessary, as they were in <u>AutoZone</u>.

On balance, the third subclass is ascertainable.

**2.**     **Rule 23(a)**

Even assuming that each of Plaintiffs' proposed subclasses satisfied the ascertainability

requirement, the subclasses fail to satisfy all of the requirements of Rule 23(a).

**A.**     **Numerosity**

The class must be so numerous that joinder of all members individually is "impracticable."

<u>See</u> Fed. R. Civ. P. 23(a)(1).  When evaluating numerosity, courts should consider the number of

class members, whether their identities are known, the geographical diversity of class members, the

ability of individual claimants to institute separate suits, and whether injunctive relief is sought.  <u>See</u>

William W. Schwarzer, <u>et al.</u>, <u>Federal Civil Procedure Before Trial</u>, §§ 10:260-10:264 (Rutter Group

2009).  Here, there is no dispute that the proposed class is sufficiently numerous for class

certification purposes.

**B.**     **Commonality**

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  This

standard is not strictly construed:

> Rule 23(a)(2) has been construed permissively.  All questions of fact and law need
> not be common to satisfy the rule.  The existence of shared legal issues with
> divergent factual predicates is sufficient, as is a common core of salient facts coupled
> with disparate legal remedies within the class.

Hanlon v. Chrysler, 150 F.3d 1011, 1019 (9th Cir. 1998), see also Staton v. Boeing, 327 F.3d 938,

953 (9th Cir. 2003).  In Dukes, the Supreme Court addressed the commonality requirement:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, supra, at 157, 102 S.Ct. 2364. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
> "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Nagareda, supra, at 132.

Dukes, 131 S. Ct. at 2551 (emphasis in original).  The Dukes Court continued:

> We recognized in Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160, 102 S.Ct. 2364, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," id., at 161, 102 S.Ct. 2364; see id., at 160, 102 S.Ct. 2364 ("[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable").  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. " '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " Falcon, supra, at 160, 102 S.Ct. 2364 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); some internal quotation marks omitted).  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation. See Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 676–677 (C.A.7 2001) (Easterbrook, J.).

Id. at 2551-52.

Plaintiffs argue in this case that there are several key common questions, including whether

Defendants failed to pay non-exempt employees for all hours worked for ISTs performed off the

clock and whether Defendants fully indemnified non-exempt employees for mileage expenses

incurred.  Plaintiffs also argue that their claims arise from Defendants' classwide policy of requiring

non-exempt employees to perform ISTs before and after their shifts or while on their lunch breaks,

and a uniform policy of not permitting mileage reimbursement for ISTs performed on the way to or from work, and other classwide policies. However, as described more fully below, Defendants had written policies to pay employees for all of their time and to reimburse business travel expenses including mileage exceeding the normal commute. Seymour Decl. ¶¶ 9, 11, 15-19.

Defendants argue generally that because Plaintiffs have only proffered eight declarations from a proposed class of over 50,000, Plaintiffs have not made a showing of commonality. Dukes, 131 S. Ct. at 2556 ("Here, by contrast, respondents filed some 120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members—relating to only some 235 out of Wal–Mart's 3,400 stores. More than half of these reports are concentrated in only six States (Alabama, California, Florida, Missouri, Texas, and Wisconsin); half of all States have only one or two anecdotes; and 14 States have no anecdotes about Wal–Mart's operations at all. Even if every single one of these accounts is true, that would not demonstrate that the entire company 'operate [s] under a general policy of discrimination,' which is what respondents must show to certify a companywide class."). The Dukes Court did not precisely quantify the number of examples relative to the size of the class required to show classwide discrimination, but the Court noted in a footnote that: "A discrimination claimant is free to supply as few anecdotes as he wishes. But when the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all." Id. Defendants have responded with numerous declarations from employees who state that they were fully compensated for their ISTs. See Def.'s Compendium of Declarations.[1]

**1.      First and second subclasses**

To prove an off-the-clock claim, a plaintiff must demonstrate that she actually worked off the

---

[1]      To counter Plaintiffs' declarations, Defendants submitted 53 declarations from employees with its opposition brief. Plaintiffs argue that the majority of those declarations should be stricken because the declarants were not disclosed to Plaintiffs and they have not had a chance to depose all of them, although they were able to depose nine of them. Plaintiffs argue that since none of the witnesses were disclosed in initial disclosures or any supplemental disclosures (even though some of the declarations are dated in June 2013, see Barragan Decl.), and were not listed as potential class members, the witnesses should be excluded (at least the ones that Plaintiffs were not able to depose) under Rule 37(c)(1) because the failure to disclose was not harmless or justified. However, any failure to disclose was harmless because Plaintiffs were able to depose nine of the declarants, and these declarations alone support Defendants' arguments -- the rest are to the same effect.

United States District Court
For the Northern District of California

1   clock, that she was not compensated for it, and the employer was aware or should have been aware

2   that she was performing off the clock work.  See York v. Starbucks Corp., 2011 U.S. Dist. LEXIS

3   155682, at *85-86 (C.D. Cal. Nov. 23, 2011) ("The record before this Court establishes the strongly

4   worded Starbucks policy that 'time worked is time paid.'  But the policy goes much further: it

5   expressly prohibits employees from working during breaks and bars working before or after the

6   completion of a shift unless punched into the time keeping system. Nonexempt employees who

7   persist in working off-the-clock are subject to discipline; likewise those employees are instructed to

8   report managers who encourage or require off-the-clock work. And managers who instruct or permit

9   their subordinates to work off-the-clock are subject to discipline including termination. In view of

10  this policy and the rationale of Dukes and Ellis, York must present evidence of a systematic

11  corporate-wide practice of forcing employees to work off-the-clock to meet Rule 23's

12  "commonality" requirement. The record will not support such a finding."); see also AutoZone, 289

13  F.R.D. at 539 ("Here, as in Brinker, there is a uniform policy prohibiting off-the-clock work. In light

14  of that policy, Plaintiffs must present substantial evidence that AutoZone requires its employees to

15  work off-the-clock. Plaintiffs present evidence that AutoZone requires employees to perform

16  opening tasks,  but not that AutoZone does not provide a means for employees to be compensated

17  for those tasks. Although Plaintiffs can point to the declarations of Plaintiffs Jimmy Ellison, William

18  Doland, and 13 other putative class members, all stating that they were systematically not paid for

19  work done before clocking in, Defendant's 133 putative class member declarations attesting to never

20  having performed or reported any off-the-clock work, undermines the notion that Defendant 'knew

21  or should have known that off-the-clock work was occurring,'. . . .") (internal citations omitted).

22          Here, the policies in the record are that employees must be clocked in when they are

23  working, and can be subject to discipline if they are not.  There is a policy under which managers

24  can adjust time records to account for any work that does take place off the clock.  Even if the ISTs

25  can be linked to specific employees through a form that may or may not have been signed by the

26  transferring employee, as in York and AutoZone, the Court would have to conduct mini-trials of all

27  putative class members to determine whether that employee performed the IST off the clock, and if

28  so, whether the employee was paid or not by adjusting the time records retroactively, as well as

**United States District Court**
For the Northern District of California

1    whether management had reason to know that the employee had worked without pay.  <u>Compare</u> Von

2    Rock Decl. Ex. C (Cohn Decl.) ¶ 5 ("I performed inter-store transfers on a number of occasions and

3    wasn't paid for that time that I spent transferring items.  A manager at CVS told me to do these

4    transfers off the clock and told me where to pick up or deliver the medication and/or merchandise."),

5    <u>with</u> Def.'s Compendium of Declarations, Ager Decl. ¶ 8; Hallen Decl. ¶¶ 8, 11, 12, 14 (employees

6    who have testified that they only performed ISTs while on the clock and/or that they were fully

7    compensated for their work time).

8         Plaintiffs argue that Defendants have a policy that "requires" non-exempt employees to

9    perform ISTs before and after a scheduled shift or while clocked out for lunch.  There is no evidence

10   of such a uniform policy or practice.  Instead, the evidence is that sometimes managers or non-

11   managers ask non-exempt employees to perform ISTs before or after their shifts or while clocked

12   out for lunch, <u>see, e.g.,</u> Von Rock Decl. Ex. C (Boone Decl.) ¶ 11, and sometimes a manager asks an

13   employee to perform an IST during the employee's shift.  <u>See, e.g.,</u> Von Rock Decl. Ex. C (Ashby

14   Decl.) ¶ 10.  Further, even if an IST is performed off the clock, Defendants' official policy is that

15   employees must be paid for all time worked and managers can change time records to account for

16   the IST.  <u>See, e.g.,</u> Def.'s Compendium of Declarations, Ager Decl. ¶ 8 (stating that the policy at her

17   home store was to require all ISTs to be on the clock).  And there is evidence that this policy of

18   paying for all time worked was followed at least as to some ISTs performed off the clock when the

19   manager knew of the IST.  <u>See, e.g.,</u> Defs' Compendium of Declarations, Auer Decl. ¶ 7 (stating that

20   she conducted ISTs before work and reported her work  time to her manager and received

21   compensation).

22        Plaintiffs also argue that the policy to ask for manual overrides of time records to account for

23   ISTs is unlawful on its face because: (1) it does not compensate employees for time spent under

24   Defendants' control while performing the IST; and (2) it does not reflect California law that time

25   spent traveling from a remote worksite is compensable if it exceeds the employee's normal

26   commute.  As to the first reason, Plaintiffs argue that under Defendants' "admitted policy,"

27   employees are not compensated for the time spent conducting ISTs.  However, there is evidence in

28   the record that some stores required that ISTs be performed while on the clock.  <u>See, e.g.,</u> Def.'s

**United States District Court**
For the Northern District of California

1   Compendium of Declarations, Ager Decl. ¶ 8.  And there is also evidence that some employees

2   requested payment for the time spent on ISTs and were paid.  Id., Auer Decl. ¶¶ 7, 8.  Thus, there is

3   no evidence of a policy to exclude payment for time spent on ISTs.

4           As to the second reason, Plaintiffs argue that under Defendants' policy, employees are not

5   compensated for time spent traveling between stores where the trip between the second store and

6   home is longer than the employee's normal commute.  Plaintiffs point to some declarations stating

7   that employees were not compensated for this time (see,e.g., Def.'s Compendium of Declarations,

8   Juricich Decl. ¶ 12, Kellett Decl. ¶ 12), but these declarations do not say that Defendants refused

9   compensation, only that the declarants did not ask for it.  Plaintiffs argue that this policy dissuades

10  employees from reporting any time at all, but Plaintiffs have not pointed to any evidence that any

11  employee, much less all or most employees, was dissuaded.

12          In addition, Plaintiffs argue that Defendants have a policy of restricting the amount of time

13  the employees in a given store may work, and that any hours in excess of that budget require District

14  Store Manager approval.  See Supp. Von Rock Decl. Ex. A (Abbott Decl.) ¶¶ 9, 10.  Plaintiffs argue

15  that this effectively prevents store managers from recording employees' time for pre- and post-shift

16  ISTs, and provides an incentive for store managers not to record that time.  There is evidence that

17  stores have budgeted hours (see Supp. Von Rock Decl. Ex. D (CVS Operations Manual - Weekly

18  Store Schedule); Ex. A (Abbott Decl.) ¶ 9), but there is no evidence that managers failed to

19  compensate employees for this reason.

20          On the issue of whether Defendants knew or should have known that its employees

21  performed ISTs off the clock, Plaintiffs have not shown how the Court could determine whether

22  Defendants' store managers across 850 stores in California over a five year period knew of each

23  instance of an alleged off the clock IST.  In fact, there is evidence that putative class members

24  performed ISTs without notifying their managers.  See, e.g., Def.'s Compendium of Declarations,

25  Ager Decl. ¶ 6, Becker Decl. ¶ 5; Flores Decl. ¶ 4.  Other putative class members performed ISTs at

26  the direction of store managers, but were not told when to perform the IST or whether it should be

27  done off the clock.  See, e.g., Weil Decl. (Boone Depo.) at 11-12.

28          Finally, Plaintiffs argue that Defendants knew of off the clock work because store managers

1   regularly reviewed Key-Rec reports.  Even if store managers review the Key-Rec reports (<u>See</u> Supp.

2   Von Rock Decl. Ex. A (Abbott Decl.) ¶ 7), the undisputed evidence is that the Key-Rec reports

3   themselves do not show which employee conducted the IST, and do not show whether the IST was

4   done on or off the clock.  Instead, individualized questions about whether Defendants knew that

5   ISTs were performed off the clock remain.

6          Further, when employees are clocked out, there is a presumption that they are not performing

7   work.  <u>Brinker</u>, 53 Cal.4th at 1051-52.  The <u>Brinker</u> court stated:

8          The only formal Brinker off-the-clock policy submitted disavows such work,
           consistent with state law. Nor has Hohnbaum presented substantial evidence of a
9          systematic company policy to pressure or require employees to work off the clock, a
           distinction that differentiates this case from those he relies upon in which
10         off-the-clock classes have been certified.

11         Moreover, that employees are clocked out creates a presumption they are doing no
           work, a presumption Hohnbaum and the putative class members have the burden to
12         rebut. As all parties agree, liability is contingent on proof Brinker knew or should
           have known off-the-clock work was occurring. Nothing before the trial court
13         demonstrated how this could be shown through common proof, in the absence of
           evidence of a uniform policy or practice. Instead, the trial court was presented with
14         anecdotal evidence of a handful of individual instances in which employees worked
           off the clock, with or without knowledge or awareness by Brinker supervisors. On a
15         record such as this, where no substantial evidence points to a uniform, companywide
           policy, proof of off-the-clock liability would have had to continue in an
16         employee-by-employee fashion, demonstrating who worked off the clock, how long
           they worked, and whether Brinker knew or should have known of their work.

17

18   <u>Id.</u> (internal citations omitted).  However, here, Plaintiffs argue that the employer, not the employee,

19   is responsible for keeping track of the time worked (<u>see</u> Wage Order 4-2001, § 7), and that if an

20   employer knows that an employee is working off the clock but has not keep accurate records, it has

21   violated the law.  <u>See</u> <u>Morillion</u>, 22 Cal. 4th at 578.  As stated above, <u>Morillion</u> is inapposite because

22   it involves compensation for time required to be spent riding in an employer's bus back and forth to

23   a work site.  Further, as described above, there is no evidence that every employees signs paperwork

24   from which Defendants could determine who performed each IST.  Plaintiffs argue that even if

25   Defendants did not know in advance that ISTs were taking place, they would know by looking at the

26   Key-Rec report and IAR binder that they had taken place, and would know that the employee who

27   conducted the IST used his personal vehicle.  Reply at 10.  Plaintiffs conclude that, therefore,

28   Defendants had actual knowledge regarding every IST and the employee's incurring of expenses.

United States District Court
For the Northern District of California

1   Plaintiffs' conclusion is not persuasive, especially because there is evidence that some ISTs were not

2   done in personal vehicles, and some were done within the normal commute to work or home.

3          The second subclass also fails for lack of commonality.  Under California law, Defendants

4   are required to reimburse Plaintiffs for all necessary expenses incurred in performing their duties.

5   See Cal. Labor Code § 2802 ("An employer shall indemnify his or her employee for all necessary

6   expenditures or losses incurred by the employee in direct consequence of the discharge of his or her

7   duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the

8   employee, at the time of obeying the directions, believed them to be unlawful.").  Here, whether

9   putative class members incurred an expense varies.  Some class members did not conduct ISTs and

10  did not otherwise use their vehicles for business purposes (see, e.g., Def.'s Compendium of

11  Declarations, Barton Decl. ¶ 9), and as described above, there is likely no reliable  way to determine

12  which employees conducted most of the ISTs.  Second, even if an employee performed an IST, he or

13  she may not have incurred an expense.  See, e.g., Def.'s Compendium of Declarations, Barton Decl.

14  ¶ 7 (stating that he has only seen ISTs performed using rental trucks paid for by Defendants);

15  Schmidt Decl. ¶ 7 (stating that ISTs were usually performed by store manager or by rental truck).

16         Further, the question of whether putative class members actually sought reimbursement is an

17  important one, and there is no common answer to that question.  See Chavez c. Lumber Liquidators,

18  Inc., 2012 U.S. Dist. LEXIS 40984, at *29-30 (N.D. Cal. Mar. 26, 2012) ("The Court finds that

19  certification is inappropriate for the Unpaid Reimbursement Class because, under Rule 23(b),

20  common issues do not predominate. Plaintiffs have not shown that LLI instituted a uniform policy

21  resulting in the denial or reimbursement requests. In fact, LLI's Travel and Entertainment policy

22  (T&E Policy) allows for reimbursement of a number of business-related expenses, including

23  mileage. Accordingly, to assess the merits of Plaintiffs' reimbursement claim, the Court would need

24  to scrutinize each class member's claimed expenses. Specifically, the Court would need to make

25  individualized factual determinations concerning: (1) whether the claimed expenses were

26  "necessary" and incurred in direct consequence of the discharge of the employee's duties; (2)

27  whether the employee actually sought reimbursement from LLI for the expenses; and (3) whether

28  LLI reimbursed the employee for the expense.") (internal citations omitted).  Even if the commute

United States District Court
For the Northern District of California

1    exclusion is improper, there are individual instances of how ISTs were performed that would require

2    individual determinations.

3         In conclusion, the first and second subclasses fail to satisfy the commonality requirement of

4    Rule 23(a).

5                    **3.      Third subclass**

6         Plaintiffs' theory for the third proposed subclass has shifted over time, from a general failure

7    to indemnify business expenses in the first amended complaint, to the more narrow argument in this

8    motion that Defendants' mileage reimbursement rate was inadequate to reimburse all employees

9    because it was $0.05 to $0.17 per mile less than the IRS standard rate.  This narrow proposed

10   subclass was not pled in the operative first amended complaint.  See Munoz v. Guimarra Vineyards

11   Corp., 2012 U.S. Dist. LEXIS 93043, at *52-53 (E.D. Cal. July 5, 2012) (recommending denial of

12   class certification for a subclass for unpaid rest breaks because the class was based on a claim that

13   was not pled in the operative complaint); York, 2011 U.S. Dist. LEXIS 155682, at *31 (rejecting

14   class certification of two subclasses because the operative complaint did not give adequate notice of

15   the claims that support certification of the two subclasses).  At the hearing, Plaintiffs could not point

16   to any paragraph in the first amended complaint setting forth the claim that the mileage

17   reimbursement rate was improperly less than the IRS rate.  Thus, certification of this subclass is

18   denied.

19        Even if Plaintiffs had pled in the first amended complaint that Defendants' mileage

20   reimbursement rate was impermissibly less than the IRS standard rate, certification of this subclass

21   would still be denied.  Plaintiffs' third subclass rests on the argument that the IRS standard rate is

22   the presumptively reasonable rate.  See Gattuso v. Harte Hanks Shoppers, Inc., 42 Cal.4th 554, 564-

23   66 (2007).  The Gattuso case, however, does not hold that the IRS rate is presumptively reasonable;

24   rather, the Gattuso Court stated that the IRS rate was widely used by private business employers and

25   that California Labor Code section 2802 permits use of the IRS rate to calculate expense

26   reimbursement.  The Gattuso court also noted that there are two ways to compensate for mileage: (1)

27   the actual expense method, which requires employees to keep detailed and accurate records of

28   amounts spent in fuel, maintenance, repairs, insurance, registration and depreciation, apportioned

between personal and business use; and (2) the mileage reimbursement method, which requires employees only to submit the number of miles driven to the employer, which then multiplies the work-required miles by a predetermined amount that approximates the per-mile cost of owning and operating a vehicle. <u>Gattuso</u>, 42 Cal.4th at 568.  Here, Defendants used the mileage reimbursement method, which employees may only challenge based on their own particular individual circumstances such as mileage per gallon and age of the vehicle used:

> Because a mileage rate used in the mileage reimbursement method is merely an approximation of actual expenses, the mileage reimbursement method is inherently less accurate than the actual expense method. . . .  If the employee can show that the reimbursement amount that the employer has paid is less than the actual expenses that the employee has necessarily incurred for work-required automobile use (as calculated using the actual expense method), the employer must make up the difference.

<u>Id.</u> at 569.

Thus, any challenge to Defendants' mileage reimbursement method would require Plaintiffs to show that the mileage reimbursement was less than class members' actual expenses.  That showing would require myriad answers to individualized questions for each class member, including what make and vintage of vehicle was used, whether it was financed or leased and, if so, at what cost, and what kind of fuel was used.  Analysis of actual expenses is not appropriate for class treatment because it would not present issues common to the class.

**Conclusion**

Because Plaintiffs' proposed subclasses fail for lack of commonality and also because the third proposed subclass was not pled in the operative complaint, the Court need not reach the remaining components of the Rule 23(a) analysis or the requirements of Rule 23(b)(3).  Plaintiffs' Motion for Class Certification is denied.  A case management conference is scheduled for January 14, 2014 at 3:00 p.m.  A joint case management conference statement shall be filed no later than January 7, 2014.

**IT IS SO ORDERED.**

1

Dated:  December 2, 2013

2

ELIZABETH D. LAPORTE
United States Magistrate Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California